FILED

2014 Jun-13  PM 03:27
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

RAGAN T. LIVINGSTON and )
MITCH LIVINGSTON, )
         )
      Plaintiffs, )
         )
v. )       Case No.:  2:11-cv-1369-JEO
         )
MARION BANK AND TRUST CO. and )
CONRAD TAYLOR, )
         )
      Defendants. )

## REPORT AND RECOMMENDATION

In this action, Plaintiffs Ragan Tolar Livingston and her husband Mitch Livingston assert

claims against Marion Bank and Trust Co. and its president, Conrad Taylor, ("Defendants"),

alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42

U.S.C. § 2000e *et seq.*, and Alabama state law.  (Doc.[1] 1 ("Complaint" or "Compl.")).  The

action was assigned to the undersigned United States Magistrate Judge pursuant to this court's

general order of reference.  The cause now comes to be heard for a report and recommendation,

*see* 28 U.S.C. § 636(b), FED. R. CIV. P. 72(b)(1), on Defendants' motion for summary judgment.

(Doc. 44).  The parties have submitted evidence and briefed their respective positions on the

motion, which is ripe for decision.  Upon consideration, it will be recommended that Defendants'

---

[1]References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of
the Court to the pleadings, motions, and other materials in the court file, as reflected on the
docket sheet in the court's Case Management/Electronic Case Files ("CM/ECF") system.  Unless
otherwise noted, page citations to briefs, evidence, and other papers in the court file are to the
page number of the electronically filed document, which may not coincide with pagination on the
original "hard copy."  However, pinpoint citations to all depositions are to the page of the
deposition transcript.

motion for summary judgment be granted in part and denied in part.

## I.      SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, party is authorized to move for summary judgment on all or part of a claim or defense asserted either by or against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PROC. 56(c)(1)(A), (B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T.*

*Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    BACKGROUND[2]

In early February 2008, Plaintiff Ragan Tolar Livingston ("Ragan") interviewed for a job with Defendant Marion Bank & Trust ("the Bank").  (Doc. 55-1 ("Ragan Aff.") at 1[3]).  Interviewed by Defendant Taylor, who is the Bank's president, and, Lisa Rayfield, his personal assistant at the Bank's main branch in Marion, Alabama (Ragan Aff. at 1), Ragan was informed that she was being considered for a position as Taylor's personal assistant at the Bank's other branch recently opened in Selma, Alabama.  (*Id.*)  After a second interview, Ragan was offered the position, at which time it was explained to her that she would train at the Marion branch for approximately two months and then transfer to the Selma branch.  (*Id.*)  At that interview, Ragan was also told that Taylor was the highest ranking official at either branch and that no one else at the Bank had more authority or could make final decisions.  (*Id.*)  Ragan accepted the position, and she began working at the Marion branch on February 11, 2008.  (Deposition of Ragan

---

[2]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the Plaintiffs. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F. 3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp 2d 1266, 1267 n.1 (N.D. Ala 1998).  Indeed, many of the material circumstances in this case are sharply contested.

[3]Ragan's Affidavit has no page or paragraph numbers, aside from Bates stamping. Citations herein to her affidavit are to the pagination of the electronically filed Doc. 55-1.

Livingston ("Ragan Dep.") at 65, 88-89[4]).

Upon her hire, Ragan was 23 years old and had been married to her husband (and co-plaintiff here) Mitch Livingston ("Mitch"), for approximately 10 months.  One Saturday soon after Ragan her employment began, Taylor, who was then 62 years old, called her into his office around closing time for a private meeting to talk about Ragan and Mitch bringing into good standing certain of their accounts with the Bank.  (*See* Ragan Aff. at 2; Ragan Dep. at 140-41).  While the meeting started on that topic, Taylor began to ask Ragan personal questions about her marriage to Mitch and make disparaging remarks about him.  (Ragan Aff. at 2; Ragan Dep. at 140-42).  Several months before marrying Mitch, Ragan had given birth to a daughter by another man she had previously dated, who also happened to be Taylor's nephew.  (Ragan Dep. at 26-27, 141-42).  Taylor asked Ragan whether "she was in love with" with Mitch, whether she had married him "for real" or married him "for show" just "to make his nephew angry," and whether she "had ever considered divorce."  (Ragan Dep. at 141; Ragan Aff. at 2).   Ragan responded that "of course" she and Mitch had gotten married "for real" and that they "loved each other."  (Ragan Dep. at 142; Ragan Aff. at 2).

In the period following that uncomfortable meeting, Taylor subjected Ragan to other conduct she considered sexually harassing.  Also early in her employment, Ragan was in Taylor's office when he pressed her for details about her sex life, asking her "how good the sex was" with her husband, and he attempted to engage her in a discussion about sexual positions, by asking her

---

[4]Citations to Ragan's Deposition are to the page of the reporter's transcript.  That deposition is included within Doc. 46-1 (transcript pages 1-280) and Doc. 46-5 (transcript pages 281-376).

whether Mitch would "bend[ her] over" and whether she preferred "to ride on top."[5]  (Ragan

Dep. at 142, 205-07).  On another occasion, Taylor similarly suggested to Ragan that she take up

horseback riding because it was "good practice for when it's time to ride on top."  (*Id.* at 199-

202, 206).  Taylor also began to call Ragan "sexy" approximately every other day (Ragan Dep. at

148-49), and he would make other comments, like, "How are you doing, good looking?"  (Regan

Dep. at 186).  On two or three occasions, Taylor invited Ragan to "sit in his lap" (Ragan Aff. at

3), and on another, as he was headed on vacation to Tennessee, he suggested that Ragan should

accompany him and "leav[e her] husband at home."  (Ragan Dep. at 177-78).  Once, when Ragan

was talking to Taylor about a past due loan on a hearse owned by a local funeral parlor, Taylor

remarked suggestively, "Imagine what you could do in the back of a hearse."  (*Id.* at 178).  She

claims that she also once heard him "imagine out loud sexual fantasies [he had] regarding the

wife of one of the bank customers."  (Ragan Aff. at 3; *see also* Ragan Dep. at 217-19).  On

another occasion, when Ragan and her mother were walking together in town, they encountered

Taylor, who made a remark likening women to "dogs ... with two legs" in which he stated that he

---

[5]At her deposition, taken in November 2011, Ragan alleges that Taylor's first made such
comments and inquiries about her sex life with her husband at that first Saturday meeting in
Taylor's office arounding closing time, when they were speaking about bringing her accounts
into good standing. (*See* Ragan Dep. at 196-97, 205-07).  In her earlier affidavit, sworn in March
2009, however, Ragan does not include such sexually explicit remarks by Taylor at that
particular meeting.  (Ragan Aff. at 2).  Instead, she alleges only that Taylor had made more
ambiguous inquiries about whether she was in love with Mitch and whether she had married him
"for real" or just "for show."  (*Id.*)  That being said, Ragan does later in that affidavit allege that
Taylor made vulgar remarks about her sexual relationship with her husband, on occasions that
are not specifically identified, which included "suggesting dirty things that [Taylor] would guess
should be a part of [Ragan's and her husband's] intimate relationship."  (*Id.* at 3).  Any such
minor discrepancies regarding whether a given remark occurred on one particular occasion
versus another, however, are not material to the recommendations of the undersigned with regard
to the viability of any cause of action at summary judgment.

had to "beat them off with a stick." (Ragan Dep. at 150-51). In another incident, Ragan had balked at altering a bank record in the way Taylor had directed her to, advising that it could cause problems if there were an audit. (*Id.* at 93). Taylor replied, "Well, I guess that makes me a bad boy, doesn't it? Why don't you bend me over your knee and give me a spanking. You know, I deserve it." (*Id.*) Ultimately, Ragan alleges that the "number of inappropriate comments directed towards [her] is too many to count" and that she experienced "incidents" of "sexual harassment" "several times each week." (Ragan Aff. at 2).

Ragan also alleges that Taylor made other remarks that might be viewed as innocuous in themselves, such as regular compliments on her dress and appearance. (*See* Ragan Aff. at 2). Ragan acknowledges that she would have ordinarily viewed those as flattering, but she claims that Taylor's "body language, paired with the tone of his voice, always made [her] extremely uncomfortable," as he would suggestively "give [her] a slow look down with a disgusting grin, look [her] in the eyes and tell [her] that [she] looked especially nice." (*Id.* at 2-3; *see also* Ragan Dep. at 186-88). Ragan further suggests that she was put off by such compliments because of other, more overt, sexually vulgar and demeaning remarks and inquiries that Taylor made.

In particular, Ragan claims that her work environment became more hostile following an episode in May 2008. By that point, the original plan to transfer Ragan to the Selma branch had been put on hold indefinitely, and her duties at the Marion branch revolved primarily around collections on past due accounts. (Ragan Aff. at 4; *see also* Ragan Dep. at 250). Ragan became anxious one day because appearing in her past-due journal was the name of a certain bank customer who, she claims, had forcibly raped her at knife point and threatened to kill her in an

incident that had occurred several years earlier when they were both in high school.[6]  (Ragan Aff. at 3-4).  Desiring to avoid speaking directly with the customer, Ragan mailed him several notices that his account was past due.  (*Id.* at 4).  After no response was forthcoming, Taylor was reviewing Ragan's journal entries a few weeks later when he asked her why she had yet to call the customer on the phone.  (*Id.* at 4).  Up to that time, Ragan had told only a few people about the rape and only then after about two years had passed.  (*See id.* at 3-4; Ragan Dep. at 123-29). Not wanting to disclose the incident to Taylor, Ragan answered vaguely that she and the customer had a problem when they were in high school and that they no longer spoke.  (Ragan Aff. at 4).  When Taylor inquired further, Ragan again attempted to put him off, telling him that it had happened a long time ago and that she just wanted to put it behind her.  (*Id.*)  Taylor replied that if it was going to interfere with her job he needed to know more about the matter. (*Id.*)  Feeling she could no longer avoid doing so, Ragan told Taylor that the customer had raped her when she was 17, and she asked that his collections account be reassigned to another employee.  (*Id.*)  Taylor allegedly responded by telling her that there was no reason to reassign the customer's account and by further insisting that she tell him the details of the rape itself.  (*Id.*; Ragan Dep. at 117-20).  Ragan told Taylor that she could not recall much about the episode. (Ragan Aff. at 4; Ragan Dep. at 119).  Unsatisfied, Taylor stated that he did not believe that she could not remember, and he followed up with a string of intimate questions that included where

---

[6]The customer denies that accusation.  (*See* Doc. 55-27 at 37-42).  It should be noted that the parties squabble somewhat over whether the name of the customer that Ragan claims raped her years ago should be disclosed or redacted in these pre-trial proceedings. (*See* Doc. 55 ("Pls. Opp. Brief") at 9 n. 2).  The undersigned has chosen not to reveal the name of the customer in this Report and Recommendation because there are privacy interests potentially at stake, particularly given that the customer would have been a minor at the time it occurred, and his identity is simply immaterial to the disposition of Defendants' motion for summary judgment.

the rape took place, what clothing had remained on her body, where the assailant had held the knife, what sexual position she was in, and what she was thinking while the rape was occurring. (Ragan Aff. at 4-5; Ragan Dep. at 118-19, 212).  Although Ragan let Taylor know several times that it was "not okay" to be talking about the incident (Ragan Dep. at 223), he nonetheless forced her to relive the incident in vivid detail, causing "feelings of shame and guilt [to] flood[ ] back to [her] conscious memory." (Ragan Aff. at 5; *see also* Ragan Dep. at 116-20).  Ragan then attempted to gather her files and go to the ladies room, but Taylor instructed her to stop and sit down.  (Ragan Aff. at 5).  When Ragan complied, Taylor leaned forward on his desk and announced to Ragan that she "had not been raped."  (*Id.*)  Rather, he proclaimed, "Women enjoy it when men treat them in that sort of way."  (*Id.*)  Suggesting to Ragan that she was lying about the fear she said he experienced, Taylor told her that she had "wanted it," that "women like to be forced," that he knew that "she liked it," and that Ragan herself "knew that too."  (Ragan Dep. at 115, 118-19; Ragan Aff. at 5).

Ragan further claims that in the wake that discussion, Taylor would taunt her about claiming to have been raped.  (Regan Dep. at 169-71, 212-14; Ragan Aff. at 5).  Typically, Ragan says, any time that the name of the customer or a member of his family would come up on her past-due journal or otherwise in the Bank's business, Taylor would ask her rhetorically whether the customer was the one that she said had raped her.  Taylor allegedly made "many, many references similar to that," sometimes in the presence of others, including once in front of the mayor of Marion.  (Regan Dep. at 169-72, 212-14).  On some those occasions, Ragan asserts, Taylor further added that "she knew she had liked it, though."  (*Id.* at 169).  Ragan claims that Taylor's "habit of constantly bringing up this particular incident in conversation, whether in the

presence of others or not, was very disturbing to [her] mental state."[7]  (Ragan Aff. at 5).

Ragan claims that Taylor also frequently touched her in ways that made her uncomfortable.  She states, for example, that he would at times "touch [her] hair ..., just in passing," while complimenting her appearance.  (Ragan Dep. at 189).  For example, Ragan recalled that just before work one morning, she and Taylor crossed paths in a stairwell, at which time he complimented her appearance and reached out and touched her hair as it hung loosely on the side of her head, in an intimate way like her husband would play with her hair.  (*Id.*)  Ragan further alleges that she and Taylor would "quite often" be looking at the same file or document, which he would use as an opportunity to "tug on [her] skirt or blouse" or put his hand "in the small of her back" in an attempt to "guide" or "draw [her] closer to him."  (Ragan Aff. at 3; Ragan Dep. at 173-76).  At times, she says, she would "pull away" to put space between them, to which Taylor would react by appearing "miffed."  (Ragan Dep. at 174).  Ragan claims that this sort of touching occurred "at least once a week."  (*Id.* at 174-75).

On one such occasion, in late July 2008, Taylor and Ragan were alone in his office when he told her how "cute" she looked, and he "tugged at [her] blouse" so as to pull undone the tie strings securing the back of her blouse.  (Ragan Aff. at 3; *see also* Ragan Dep. at 96-103).  Ragan became embarrassed and quickly tried to leave his office.  (Ragan Aff. at 3).  Taylor stopped her, however, reaching out and grabbing her arm.  (*Id.*)  Then, with "a smug grin on his face," Taylor told her, "You better be careful not to let anyone see you like my office like that.  The other

---

[7]Taylor claims that Ragan told him about being raped without him asking about it, and he denies that he asked Ragan any questions about the rape or that he ever brought the subject up after their initial conversation or told anyone else about it during Ragan's employment.  (*See* Doc. 46-11, 46-12 ("Taylor Dep."), at 162-63, 172-73).  Of course, the court must at summary judgment accept Ragan's contrary testimony as true.

employees will assume that we have something going on, and the other women will be jealous.
Close the door and let me tie that back for you." (*Id.*)  Ragan froze as Taylor then "took a
seemingly extraordinary amount of time as he slowly tied [Ragan's] blouse back into a perfect
bow." (*Id.*)  Mortified by the incident, Ragan went to the ladies' room and cried. (*Id.*)  Ragan
suggests that she suffered similar crying spells at work on other occasions as well because of
Taylor's harassment. (Ragan Aff. at 5).  Eventually she became "terrified all the time" (Ragan
Dep. at 147), and attempted to avoid having to discuss her past-due journal with Taylor, which
led to a verbal reprimand. (*See* Ragan Dep. at 244-45, 252-53).

Ragan alleges in her affidavit that, in early September 2008, Taylor made a "remark
suggesting that [she] make him happy by having sex with him."[8] (Ragan Aff. at 5).  Rather than
trying to ignore him as she usually did, she turned to Taylor and told him that "if he did not begin
to respect [her] and stop harassing [her, she] would have no other choice than to speak with [his]
wife about the problem." (*Id.*)  In recounting that episode in her deposition, Ragan articulated
the substance of her statement somewhat differently, alleging that she told Taylor that if he
"didn't quit hitting on [her] [she] was going to have to say something to [his wife]." (Ragan Dep.

---

[8]Defendants asserted in their statement of facts that "Taylor never directly asked Ragan to
have sex with him but he made comments that she believed suggested it." (Doc. 47 ("Dfts.
Brief") at 8, ¶ 13).  Plaintiffs take issue with that, pointing to Ragan's affidavit in which she
alleges that Taylor once "made a perverted remark suggesting that [Ragan] make him happy by
having sex with him." (Pls. Opp. Brief at 10, ¶ 13 (quoting Ragan Aff. at 5)).  Defendants
replied by emphasizing that, during her deposition, Ragan did not assert that Taylor made such a
remark or otherwise suggested so directly that she have sex with him. (Doc. 52 ("Dfts. Reply")
at 5-6, ¶ 13; *see also* Ragan Dep. at 177).  However, Defendants have failed to show that Ragan's
allegation in her affidavit that Taylor made the remark is inherently and unambiguously
contradicted by her deposition testimony.  *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54
(11th Cir. 1986).  Further, whether Taylor's "happy" remark is characterized as a solicitation for
sex or merely a "suggestion" is immaterial.

10

at 132-33; *see also* Doc. 1-1 ("EEOC Charge") at 1 ("I informed [Taylor] that if the sexual harassment did not stop, I would tell his wife, who is a bank employee.").  Although Taylor's wife Linda also worked for the Bank at the Marion branch, it is undisputed that she had no supervisory authority over Taylor in an employment capacity.  It should be noted, however, that while the Bank had promulgated a sexual harassment policy in an employee handbook shortly before Ragan was hired, the handbook specifically directs employees to report sexually harassing conduct to his or her "supervisor," who is then to report it to the President of the Bank.  (*See* Taylor Dep., at 68; Doc. 55-42 ("Employee Handbook") at 6).  And given that Taylor was both Ragan's supervisor and the President of the Bank, he was the only person designed by the Bank's policy to receive sexual harassment complaints from her.

On September 9, 2008, "less than a week" after Ragan made the complaint and threat to Taylor, he called her into his office around lunch time to discuss a past due account in her journal.  (Ragan Aff. at 5).  Without warning, Taylor began to make "hostile remarks" to Ragan, including "several" about her having been raped.  (*Id.*)  He told her at that time that she "carried to much emotional stress" and required her to go home immediately and take one week's vacation.  (*Id.*)  A few days later, but before her mandated week of vacation had expired, Ragan stopped by the Marion branch to check her account balance.  (*Id.* at 5-6).  When she went inside, Rayfield told her that Taylor wanted to see her.  (*Id.* at 6).  Ragan went into Taylor's office, at which time he told her that the Bank had decided to terminate her employment, supplying no further explanation.  (Ragan Aff. at 6).

On October 7, 2008, Ragan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (EEOC Charge).  That resulted in a determination by the

11

EEOC that there was reasonable cause to believe that Ragan had been subjected to unlawful sexual harassment and was then terminated in retaliation for complaining about it.  (Doc. 55-6). Ragan and Mitch (collectively "Plaintiffs") filed this action in April 2011.  In what are denominated as "Count One and Two" of the Complaint, Ragan asserts "two separate claims against Defendants Marion Bank and Trust by and through the actions of ... Taylor," for "Sexual Harassment" and "Quid Pro Quo and Hostile Work Environment," in violation of Title VII. (Compl. ¶¶ 25-33).  In Count Three, captioned "Gender Discrimination" and also based on Title VII, Ragan alleges that she "has been discriminated against on the basis of her sex in regard to her work environment, training, promotion, job assignments, job pay, and terms and conditions of employment."  (*Id.* ¶ 35).  Count Four asserts another Title VII claim, alleging that she was subjected to unlawful retaliation for complaining about sexual harassment.  (*Id.* ¶¶ 38-42).  In Counts Five through Nine, Ragan asserts claims under Alabama state law for "negligent and wanton hiring, training, supervision, and retention (Compl., Count Five, ¶¶ 43-50); invasion of privacy (*id.*, Count Six, ¶¶ 51-57); "assault and battery" (*id.*, Count Seven, ¶¶ 58-64); intentional infliction of emotional distress (*id.*, Count Eight, ¶¶ 65-72); and "breach of implied contract." (*Id.*, Count Nine, ¶¶ 73-78).  In the tenth and final count, Mitch asserts a claim for loss of consortium.  (Compl. ¶¶ 79-81).  Both Defendants have moved for summary judgment.

## III.    DISCUSSION

### A.    Title VII

Ragan claims she was subjected to a hostile work environment based on sexual harassment in violation of Title VII.  In Count Three she asserts another Title VII cause of action "gender discrimination," based on allegations that she has "been discriminated against on the

basis of her sex in regard to her work environment, training, promotion, job assignments, job

pay, and terms and conditions of employment." (*Id.* ¶ 35). Both types of claims allege violations

of the substantive anti-discrimination provision of Title VII, which makes it an "unlawful

employment practice ... for an employer to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C. §

2000e-2(a)(1).

In Count Four, Ragan alleges that she was subjected to retaliation made unlawful by Title

VII. Such claim is based upon an alleged violation of 42 U.S.C. § 2000e-3(a), which provides in

relevant part:

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees ... because he has opposed any practice made an
> unlawful employment practice by [provisions of Title VII prohibiting
> discrimination because of race, color, religion, sex, or national origin] or because
> he has made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this subchapter.

Defendants have moved for summary judgment on the Title VII claims for sex discrimination

and for unlawful retaliation.

**1.      Title VII Claims Against Taylor**

Taylor contends that he cannot be liable under Title VII for either a discrimination or

retaliation theory because, among other reasons, he is not alleged to be an "employer" under the

statute, which does not allow for individual liability. *See Dearth v. Collins*, 441 F.3d 931, 933

(11th Cir. 2006); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). While Taylor's

belief that he is a target of Title VII claims may not be wholly unfounded, Plaintiffs expressly

acknowledge that they are not asserting Title VII claims against Taylor individually.  (Pls. Opp.

Brief at 21).  Accordingly, to the extent that the Complaint might be interpreted as raising Title

VII claims against Taylor, such claims are due to be dismissed.

    **2.**    **Title VII Claims Against the Bank**

        **a.**    **Hostile Work Environment**

Ragan first claims that the Bank is liable under Title VII for allegedly subjecting her to a

hostile work environment because of sex.  To prove such a claim, she has the burden at trial to

show

> (1) that he or she belongs to a protected group; (2) that the employee has been
> subject to unwelcome sexual harassment, such as sexual advances, requests for
> sexual favors, and other conduct of a sexual nature; (3) that the harassment must
> have been based on the sex of the employee; (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and conditions of employment
> and create a discriminatorily abusive working environment; and (5) a basis for
> holding the employer liable.

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (quoting

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)).  The Bank argues that

it is entitled to summary judgment on the ground that Ragan cannot establish either the third or

fourth element above, *i.e.*, that the harassment was because of sex or that it was sufficiently

severe or pervasive to alter the terms and conditions of her employment.  Those arguments are

addressed in turn.

        **i.**    **Harassment "Because of" Sex**

The Bank first contends that "no evidence demonstrates that the conduct Ragan

[complains of] was based on her sex."  (Dfts. Brief at 17).  In support, the Bank emphasizes that

the Eleventh Circuit has stated that

statements and conduct must be of a sexual or gender-related nature–'sexual advances, requests for sexual favors, [or] conduct of a sexual nature,' [*Mendoza*, 195 F.3d] at 1245–before it can be considered in determining whether the severe or pervasive requirement is met.  Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff) are not counted.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *overruled on other grounds*, *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).  On that score, the Bank contends that Ragan has not "alleged facts sufficient to show that Taylor's alleged comments to her were related to her gender." (Dfts. Brief at 18).  The Bank acknowledges that Ragan "has alleged that Taylor complimented her on her appearance, inquired about her sex life with her husband, and on one occasion made her talk about an alleged rape." (*Id.*)  The Bank contends, however, that such compliments, "without more, [are] not inherently related to sex" and that asking Ragan about her "sex life does not violate Title VII because the question is not gender-specific and the offense (if any) associated with such inquiry would be equally shared by both genders." (*Id.*)  The Bank likewise argues that Ragan cannot demonstrate that the instances in which Taylor allegedly touched her were "based on her sex" because she does not claim that he "touched her breast, buttocks, vaginal area, or any other female-specific part of her anatomy." (*Id.*)  Instead, the Bank contends, Ragan claims only "platonic contact" in which he "touched her face, hair, back, and her shirt," allegedly unaccompanied by "any sexual comments." (*Id.*)

In order for statements and conduct of the employer or his agents to "count" towards the creation of a sexually hostile work environment actionable under Title VII, it is necessary that the jury be able to draw a reasonable inference that the harassment occurred "because of" sex.  *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not

prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat*[*ion*] ... because of ... sex.'" (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis original)); *see also Reeves*, 594 F.3d at 809.  Further, "[a]lthough gender-specific language that imposes a change in the terms or conditions of employment based on sex will violate Title VII, general vulgarity or references to sex that are indiscriminate in nature will not, standing alone, generally be actionable." *Reeves*, 594 F.3d at 809.  "The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace," *Oncale*, 523 U.S. at 81, so workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 80.

On the other hand, any form of harassment that meets Title VII's statutory definition of discrimination because of sex may give rise to an actionable hostile work environment. *Oncale*, 523 U.S. at 79-80.  The Eleventh Circuit has long recognized that a plaintiff can establish that harassment was "based on her sex" by showing "that but for the fact of her sex, she would not have been the object of harassment.'" *Mendoza*, 195 F.3d at 1248 n.5 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)); *see also Phillips v. Smalley Maintenance Serv., Inc.*, 711 F.2d 1524, 1529 (11th Cir. 1983).  It is typically easiest to draw that inference in male-female sexual harassment situations where the challenged conduct "involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." *Oncale*, 523 U.S. at 80; *see also Henson*, 682 F.2d at 904.  Further, in such situations, "unless there is evidence to the contrary, ... [courts] also infer that the harasser treats members of the 'non-preferred' gender differently–and thus that the harasser harbors an impermissible discriminatory animus towards persons of the preferred gender."

16

*Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 (11th Cir. 1998).

Indeed, as the Bank highlights, the Eleventh Circuit stated in *Gupta* that "statements and conduct must be of a sexual or gender-related nature–'sexual advances, requests for sexual favors, [or] conduct of a sexual nature,' [*Mendoza*, 195 F.3d] at 1245–before it can be considered in determining whether the severe or pervasive requirement is met." 212 F.3d at 583. Courts, however, must be careful not to take that admonition too far, which could be interpreted to suggest that "sexual advances, request for sexual favors, [and] conduct of a sexual nature" are the *sine qua non* of what qualifies as harassment "because of sex." However, as explained below, such a construction would be contrary to United States Supreme Court precedent and earlier Eleventh Circuit decisions, both of which would trump any holding in *Gupta* to the extent they conflict.[9] *See United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009).

More than 14 years before *Gupta* was decided, the Eleventh Circuit was faced with a

_____

[9]It also bears noting that *Mendoza*, the case that *Gupta* quotes in support of its assertion that "statements and conduct must be of a sexual or gender-related nature–'sexual advances, requests for sexual favors, [or] conduct of a sexual nature,'–before it can be considered in determining whether the severe or pervasive requirement is met," did not hold that only "sexual advances, requests for sexual favors, or conduct of a sexual nature" count towards the creation of a hostile work environment. While the *Mendoza* court expressed some doubts about whether the evidence allowed an inference that certain conduct was motivated by sex or gender, that discussion was dicta because the court then "assume[d], but d[id] not decide" that [the] conduct [was] sexual in nature and thus might implicate sex discrimination," 195 F.3d at 1248 (footnote omitted), and proceeded to resolve the appeal on the sole ground that all of the alleged conduct taken together was not sufficiently severe or pervasive to alter the terms and conditions of the plaintiff's employment. *Id.* Moreover, *Gupta*'s quoted language from *Mendoza* was an excerpt from the latter's recitation of the elements of the cause of action, which stated more fully that a plaintiff has the burden to show that she "has been subject to unwelcome sexual harassment, *such as* sexual advances, requests for sexual favors, and other conduct of a sexual nature." 195 F.3d at 1245 (emphasis added). The use of the phrase "such as," which is itself also quoted in an earlier section of *Gupta*, *see* 212 F.3d at 582, clearly implies that the items enumerated thereafter are illustrative, not exhaustive. *See Bragdon v. Abbott*, 524 U.S. 624, 639 (1998).

plaintiff's Title VII claim alleging that she had been subjected to harassment because of sex that resulted in her constructive discharge.[10]  *See Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497 (11th Cir. 1985).  The district court had granted summary judgment to the employer as it related to a claim for a hostile work environment under *Henson*, based on its view that the plaintiff's evidence failed to establish that "she was subject to sexual harassment" because she did "not even claim that she was subject to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature."  *Bell*, 777 F.2d at 1503 (quoting the district court's decision).  In reversing, the Eleventh Circuit concluded that the district court had applied the "wrong standard," recognizing that the plaintiff "was under no obligation to adduce proof of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature."  *Id.* (internal quotation marks and brackets omitted).  Rather, the *Bell* court explained, actionable harassment because of sex "can be of at least two kinds:  (1) a threatening, bellicose, demeaning, or offensive conduct ... because of the sex of the victim of such conduct; or (2) 'unwelcome sexual advances' ...."  *Id.*  That view was confirmed correct in *Oncale* by the Supreme Court's acknowledgments that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex,"  523 U.S. at 80, and that "a trier of fact might reasonably find [unlawful sex] discrimination ... if a female victim is harassed in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."  523 U.S. at 80; *see also Harris*, 510 U.S. at 21 (recognizing that a sexually hostile work environment may be created by

---

[10]Such have come to be known generally as compound hostile-environment constructive discharge claims.  *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-48 (2004).

"discriminatory intimidation, ridicule, and insult"); *Reeves*, 594 F.3d at 811-12 (holding that "words and conduct" that might be "reasonably read as gender-specific, derogatory, and humiliating," though not directed specifically at the plaintiff herself, were "sufficient to afford the inference that the offending conduct was based on the sex of the [plaintiff].").

Further, the Eleventh Circuit and the Supreme Court have both recognized that even if harassing conduct and statements are facially neutral, a plaintiff may establish by circumstantial evidence that such harassment was, in fact, because of sex or another protected characteristic. For example, the district court in *Bell* had dismissed the constructive discharge claim on summary judgment, concluding that, while the record showed that there had been a concerted campaign of harassment to force the plaintiff to quit, the evidence was insufficient to support that such was motivated by the plaintiff's gender. *See Bell*, 777 F.2d at 1499-1500.  The Eleventh Circuit again disagreed, ruling that the lower court had failed properly to consider certain evidence of sexually discriminatory intent, including testimony that the supervisor primarily responsible for the harassment had previously stated that, if it were up to him, there would be no women in the workplace and testimony that the supervisor did not subject male employees to similar mistreatment. *Id.* at 1500-02.  Other Eleventh Circuit decisions thereafter similarly recognized that facially neutral mistreatment might be shown to have been motivated by unlawful animus, including through evidence of the harasser's disparate treatment of persons outside of the plaintiff's protected class. *See Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir. 1988) (holding that the plaintiff made out a "prima facie case" of hostile environment sexual harassment based in part on evidence that her supervisor "grabbed [her] by the arm and physically moved her a few feet" and "berated her for her job performance," which

the "district court concluded ... would not have occurred but for [the plaintiff's] sex."); *Fredette v. BVP Management Assoc.*, 112 F.3d 1503, 1505 (11th Cir. 1997) (noting that "harassment is based on the victim's sex" where "the harasser does not treat employees of the opposite sex the same way"); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (holding that harassment in which the plaintiff was "stripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers" could support a claim of constructive discharge if otherwise shown to have been motivated by an unlawful discriminatory or retaliatory animus); *see also Mendoza*, 195 F.3d at 1248 n.5 (noting that a plaintiff might show that harassment was because of sex by proof that the harasser "treated women employees differently from male employees"); *id.* at 1253-54 (Edmondson, J., concurring).  That view was also validated in *Oncale*, where the Court indicated that even if a harasser does *not* use "sex-specific" terms in subjecting the plaintiff to mistreatment, the plaintiff "may also, of course," show that such was motivated by discriminatory animus by offering "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."  523 U.S. at 80-81.

Thus, while a harasser's use of sexual or gender-specific language and epithets may itself often support that such statements were sexually discriminatory, *see Oncale*, 523 U.S. at 80; *Beckford v. Department of Corr.*, 605 F.3d 951, 960 (11th Cir. 2010); *Reeves*, 594 F.3d at 809-10; *Llampallas*, 163 F.3d at 1246, the absence of such language does not necessarily mean that the remarks were not motivated by an unlawful animus.  In the end, that approach is the only logical one.  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other

sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).  In assessing whether harassment is actionable, "workplace conduct is not measured in isolation." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001).  Rather, "the trier of fact must determine the existence of sexual harassment in light of the record as a whole and the totality of the circumstances, ... [including] the context in which the alleged incidents occurred." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986) (internal quotation marks and citation omitted); *accord Mendoza*, 195 F.3d at 1242 ("In sexual harassment cases, the courts must consider the alleged conduct in context and cumulatively."); *see also Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810-11 (7th Cir. 2001) ("'Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct,' thereby robbing instances of gender-based harassment of their cumulative effect." (quoting *See O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001)).  Further, it is a bedrock principle of federal anti-discrimination law that circumstantial evidence may be used to prove that virtually *any* adverse treatment by an employer was motivated by prohibited discrimination, even if not accompanied by a statement directly evidencing unlawful intent.  *See generally McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) (both discussing the use of circumstantial evidence in Title VII disparate treatment cases); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("The plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a trial issue concerning the employer's discriminatory intent.").  Thus, no one doubts that a plaintiff might establish that an employer's

facially gender-neutral act of terminating her employment violated Title VII notwithstanding that the employer's decisionmaker did not call the plaintiff a "bitch" at the time she was fired.  And because harassment creating a hostile work environment is just another species of unlawful disparate treatment, *Reeves*, 594 F.3d at 808 n.2, it is likewise improper to categorize facially neutral or ambiguous harassment, such as repeatedly belittling a female employee as "incompetent," "stupid," or "worthless," as inherently nondiscriminatory simply because the insult was not then accompanied by gender-specific language.  *See Howley v. Town of Stratford*, 217 F.3d 141, 156 (2d Cir. 2000) (holding that a factfinder could infer that ostensibly gender-neutral abuse was gender-based given the contents of the harasser's earlier tirade against the plaintiff that was laced with gender-specific epithets and obscenities); *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 n. 9 (9th Cir. 2004) ("A trier of fact might certainly conclude that, in light of Hughes' use of a racial slur, his other abusive remarks to McGinest were also motivated by racial hostility.").  Therefore, while harassment that is gender neutral on its face does not *itself* give rise to an inference of discriminatory motivation,[11] such harassment may still be proven to have been "because of sex" by circumstantial evidence, including as it relates to the harasser's sexual solicitations or use of gender-specific epithets on other occasions or his more favorable

---

[11]*See Reeves*, 594 F.3d at 809 ("Sexual language and discussions that truly are indiscriminate do not themselves establish sexual harassment under Title VII."); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) ("An insulting or demeaning remark does not create a federal cause of action for sexual harassment merely because the 'victim' of the remark happens to [be a woman].");  *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) ("It is one thing to call a woman 'worthless,' and another to call her a 'worthless broad.'").

treatment of similarly situated male employees.[12]  *See Reeves*, 594 F.3d at 813 ("At the end of the day, [whether harassing conduct was motivated by sexual animus] is a question of intent, which, because intent may be difficult to discern, often requires recourse to circumstantial evidence.").

Finally, the inquiry into whether harassment was "based on" a protected characteristic "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (quoting *Oncale*, 523 U.S. at 81).  Accordingly, whether an otherwise potentially ambiguous statement or incident might be reasonably construed as motivated by a prohibited animus may depend on a host of factors and circumstances, including the immediately surrounding context, the parties' prior course of dealings, local custom, and historical practices.  *See id.*, 683 F.3d at 1297-99 (finding a question of fact with regard to whether banana peels left on a truck driven by the African-American plaintiff was intended "to send a message of racial intolerance."); *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (rejecting the Eleventh Circuit's suggestion that a plant manager's reference to each of the African-American plaintiffs as "boy" could not be evidence of discriminatory animus unless it was "modified by a racial classification like 'black' or 'white.'"). "As the Supreme Court has observed, '[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and

---

[12]This approach is universally accepted in the other courts of appeals.  *See O'Rourke*, 235 F.3d at 729-30; *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148-49 (3d Cir. 1999); *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334-35 (4th Cir. 2010); *Williams v. General Motors, Corp.*, 187 F.3d 553, 565–66 (6th Cir. 1999); *Berry,*260 F.3d at 810-11; *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999); *EEOC v. National Educ. Ass'n, Alaska*, 422 F.3d 840, 845  (9th Cir. 2005); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987); *McKinney v. Dole*, 765 F.2d 1129, 1138-39 (D.C. Cir. 1985).

relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Reeves*, 594 F.3d at 810 (quoting *Oncale*, 523 U.S. at 81-82). With the above legal principles in mind, the undersigned now turns to consider whether a jury could reasonably find that Taylor's alleged harassment of Ragan was because of sex.

Likely the most disturbing harassment in this case occurred in May 2008 when Taylor purportedly insisted, while he and Ragan were alone in his office, that she answer numerous pointed questions seeking a detailed description of an incident in which she claims to have been forcibly raped at knife point several years earlier. That inquisition, which appears to have had no possible legitimate purpose, was immediately followed by Taylor's announcement to Ragan that she "was not raped" and that she had "wanted it" and "enjoyed it" because, as Taylor told her, "women like to be forced." Directly related are Ragan's allegations that Taylor on multiple instances thereafter mocked her about claiming to have been raped, which were at times accompanied by further suggestions that she had "enjoyed it." In addition, Ragan alleges that Taylor also on several other occasions asked her about the intimate details of her sex life with her husband, including what sexual positions she preferred and whether her husband would "bend her over," and whether her marriage was "for real." The Bank would characterize all of this conduct as merely the indiscriminate use of sexual language that was not gender-specific and would be equally offensive to both sexes. The undersigned disagrees.

The Bank observes that there "may be cases when a supervisor makes sexual overtures to workers of both sexes or cases where the conduct complained of is equally offensive to male and female workers," and that, in such circumstances, the harassment would not be "based upon sex because women and men are accorded like treatment." (Dfts. Brief at 17). There indeed "may

24

be cases" in which the employer is not liable under Title VII because the harasser is shown to be an "equal opportunity harasser" that treats both genders equally badly.  *Holman v. Indiana*, 211 F.3d 399, 403-04 (7th Cir. 2000); *see also Henson*, 682 F.2d at 904.  However, "that conduct is egregious enough to offend the sensibilities of men as well as women cannot serve to immunize it for Title VII purposes."  *Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1043 (7th Cir. 1994); *see also Reeves*, 594 F.3d at 811-13 (even though employees of both genders were exposed to same objectionable remarks, a jury could find that such were sexually discriminatory because they included widespread use of gender-specific epithets and obscenities that would be more offensive to women); *cf. Beckford*, 605 F.3d at 960 (holding that a jury could find that the practice of prison inmates openly masturbating toward female prison staff was based on sex, rejecting the employer's argument that the plaintiffs "chose to work in a correctional facility that houses ... the worst of the worst.").

Furthermore, as the movant for summary judgment, the Bank bears the initial burden to direct the court to record evidence that either negates an element of Ragan's claim or that demonstrates that she will be unable to meet her burden of proof at trial as to that element; it is not enough just to say in a brief effectively that "there is no evidence" to support an element of her claim.  *See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1437-38 & n.19 (11th Cir. 1991) (en banc); *Clark*, 929 F.2d at 608-09. To that end, the Bank has not referred the court to any evidence demonstrating that Taylor subjected male employees to questioning, touching, or mistreatment like Ragan alleges.  Even if the record at this point may be unclear regarding how Taylor treated male employees, that does not entitle the Bank to summary judgment on the theory that Taylor was equally harassing to

employees of both genders.

Moreover, courts in this circuit have not hesitated to consider a male harasser's vulgar inquiries into a female employee's sex life to be sexually discriminatory conduct that may contribute to the creation of a hostile work environment. *See, e.g., Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1309 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 506-08 (11th Cir. 2000); *Phillips*, 711 F.2d at 1527-29; *Moore v. Corporate Facilities Mgmt., LLC*, 2012 WL 4329288, at *10 (N.D. Ala. Sept. 17, 2012); *EEOC v. SDI Athens East, LLC*, 690 F. Supp. 2d 1370, 1380 (M.D. Ga. 2010); *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1348-49 (M.D. Ala. 2009); *McCoy v. Macon Water Auth.*, 966 F. Supp. 1209, 1218 (M.D. Ga. 1997). So too it is here. A jury might find that Taylor's inquiries seeking for Ragan to reveal and articulate intimate details of being raped, her sex life with her husband, and the status of her marriage were implied sexual overtures, trolling designed to test the waters regarding her receptiveness to more overt advances, *see Anderson v. Hewlett-Packard Corp.*, 694 F. Supp. 1294, 1303 (N.D. Ohio 1988), or as a form of "sex talk" to gratify Taylor's own prurient interests. *See, e.g., Kracunas v. Iona College*, 119 F.3d 80, 83 (2d Cir. 1997); *cf. United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008) (characterizing the defendant's online explicit discussions with his intended victim as "consistent with his having intended to obtain sexual satisfaction vicariously.").

Further, Taylor's questions and statements can be viewed as degrading to women in particular. In a manner they suggest, and, indeed, at least once outright declared, that the proper role of women is to be sexually available and subservient to men, to the point of denying that women are ever truly physically coerced to engage in sexual acts against their will. *See Jennings*

26

*v. University of N.C.*, 482 F.3d 686, 695-96 (4th Cir. 2007) (en banc) (explicit questions and comments by male coach to members of university women's soccer team about their sex lives "frequently carried the strong suggestion of promiscuity, provoked in several players acute feelings of humiliation and degradation that were directly linked to their gender."); *EEOC v. R&R Ventures*, 244 F.3d 334, 339-40 (4th Cir. 2001) (recognizing that harasser's alleged conduct, which included having "described his sex life and discussed sexual positions" with female employees, asking a female employee "if she liked to be spanked" and if she had "gotten laid," contributed toward the creation of "an environment consumed by remarks that ridiculed and demeaned the status of women"); *Gregory v. Daly*, 243 F.3d 687, 690 (2d Cir. 2001) (complaint stated a viable hostile environment claim where it alleged that the harasser made "demeaning comments about women" in which he explained to the plaintiff "in graphic detail[ ]" how a rape may occur, and told her "how easy it is to rape a woman."); *Eastwood v. Department of Corr. of State of Okla.*, 846 F.2d 627, 629-30 (10th Cir. 1988) (plaintiff's allegations that the employer's investigator demanded, in the name of investigating her report that she had been sexually assaulted by a co-worker, that the plaintiff reveal facts about her own sexual history and threatened to fire her unless she signed a statement promising to forget the incident if the co-worker resigned, identified "actions that could constitute sexual harassment."); *cf. Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n. 3 (3d Cir. 1990) ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course.").

A jury could also reasonably find that at least most of Taylor's other comments about which Ragan complains were based on sex. Some of those were overtly sexual in nature, even

assuming they did not amount to explicit requests or demands for sexual favors.  Such would

include Taylor's repeatedly calling Ragan "sexy," his two or three invitations to Ragan to sit in

his lap, an occasion in which he told Ragan that she should bend him over her knee and "spank"

him because he was a "bad boy," his "suggest[ing] that [Ragan] make him happy by having sex

with" him, and an instance in which he stated that Ragan should leave her husband at home and

accompany him on vacation to Tennessee.  Most of Taylor's other remarks were comprised of

more sexually ambivalent compliments of Ragan's dress and appearance. However, even such

routine compliments *"*[n]ot uncommonly show a flirtatious purpose," *Gupta*, 212 F.3d at 584,

and they "take color" from Taylor's other more sexually explicit and objectifying remarks

previously discussed.  *Reed v. MBNA Marketing Systems, Inc.*, 333 F.3d 27, 30 (1st Cir. 2003);

*cf. Mendoza*, 195 F.3d at 1248 ("'[F]ollowing and staring' can betray romantic or sexual

attraction ....").  Ragan's testimony indicates that Taylor delivered his compliments with such

frequency as to be unduly solicitous and in a sexually suggestive tone that was often paired with

leering looks up and down her body.  Such implies a sexual or gender-specific motivation.  *See*

*Johnson*, 234 F.3d at 506, 509 (indicating that conduct in which the harasser "called out [the

plaintiff's] name and then looked her up and down while staring at her in a sexual manner"

contributed to a sexually hostile work environment); *Frederick v. Sprint/United Management*

*Co.*, 246 F.3d 1305, 1309, 1312 (11th Cir. 2001) (noting that "sexual asides and insinuations are

the well-worn tools of a sexual harasser" and that the plaintiff's supervisor "subjected her to a

range of discomforting behaviors" that included "star[ing] at her for prolonged periods [and]

look[ing] her up and down"); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000)

(holding that the plaintiff's evidence was sufficient to establish a sexually hostile environment

based on testimony that her supervisor made repeated statements to the effect that "women should be barefoot and pregnant," "would stand very close to women when talking to them and would look them up and down in a way that's very uncomfortable" (internal quotation marks omitted)).

Ragan also alleges multiple instances of gratuitous physical contact, often accompanied by the sort of compliments described above. On what appears to have been a few occasions, such contact entailed Taylor touching Ragan's hair or the side of her face in an intimate manner. More frequently Taylor would touch or gently pull on her clothing or put his hand in the small of her back to "guide" her closer to him, ostensibly for the purpose of looking at documents Ragan was holding. Ragan says that on some of those occasions she would "pull away" from Taylor, at which he would appear "miffed." Ragan also describes an incident in which Taylor pulled on the strings securing her blouse and they became untied. After instructing her to let him tie them back up, he took an inordinate amount of time to do so, simultaneously suggesting that other female employees might get jealous of Ragan if they thought she was having an affair with him. None of those instances of touching involved the "female-specific part[s] of her anatomy," as the Bank puts it. That does not, however, reasonably preclude that such "unwelcome remarks and touching might be done to gratify the harasser's own desires." *Durham Life Ins. Co.*, 166 F.3d at 151 n.6. Thus, the type of repeated, deliberate physical contact Ragan describes may be deemed at least to contribute to a hostile work environment, particularly in light of Taylor's other, sexual and gender-specific remarks and conduct. *See Johnson*, 234 F.3d at 509 (characterizing the harasser's sexually harassing conduct as "severe" in part because he gave the plaintiff "unwanted [shoulder] messages"); *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1189

(11th Cir. 2001) (supervisor's solicitations to the plaintiff to reinstate their intimate relationship, coupled with evidence that "on several occasions he brushed up against her in an inappropriate way while at work," was sufficient to support that the plaintiff had a reasonable belief that she was the victim of sexual harassment); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1556 (11th Cir. 1987) (identifying a supervisor's "unwelcomed sexual harassment" as including "putting his hands on [the plaintiff] to rub her shoulders or 'fool with' and smell her hair"); *Parker v. Atlanta Newspapers Name Holding Corp.*, 2006 WL 1594427, at *3 (11th Cir. June 12, 2006) (holding that, "in conjunction with" the harasser's other sexually explicit advances and comments, incidents in which he allegedly "touched [the plaintiff's] hands, elbows and shoulders a number of times and would stand 'disturbingly close to her, nearly pressing his body against hers,'" could be "objectively threatening or humiliating" instances of sexual harassment).  The Bank is not entitled to summary judgment on Ragan's hostile environment claim on the ground that a jury could not find that Taylor's alleged harassment was based on sex.

### ii.    "Severe or Pervasive" Harassment

The Bank also argues that Ragan cannot establish that the harassment of which she complains was severe or pervasive enough to alter the terms and conditions of her employment. *See Reeves*, 594 F.3d at 808.  "Either severity or pervasiveness is sufficient to establish a violation of Title VII." *Id.*  The Fifth Circuit has explained:

> An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434–35 (5th Cir. 2005).  The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists.  Thus, 'the required showing of severity or seriousness of the harassing conduct varies

30

inversely with the pervasiveness or frequency of the conduct.' *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991).

*Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007); *see also Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002); *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008).  In evaluating whether allegedly discriminatory conduct is actionable, courts consider its "frequency ...; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 808-09 (quoting *Harris*, 510 U.S. at 23).  As is done when considering whether harassment could be deemed to be based on sex, an inquiry into whether it was sufficiently severe or pervasive requires a court to view the evidence both cumulatively and in the totality of the circumstances, not in isolation.  *Id.* at 808.

The plaintiff must prove that the environment was both subjectively and objectively hostile.  *Id.* at 809.  That is, the employee must subjectively perceive the harassment as sufficiently severe or pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.  *Id.*  "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious."  *Harris*, 510 U.S. at 22 (citation omitted). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23).

The Bank only challenges the "objective" prong of the test, arguing that a reasonable person in Ragan's position would not consider Taylor's harassment to have been sufficiently

31

severe or pervasive to be illegal.  In support, the Bank asserts that "the conduct Ragan alleges is

the quintessential intersexual flirtation that the Eleventh Circuit cautions against mistaking for a

Title VII claim." (Dfts. Brief at 21 (internal quotation marks omitted).  The undersigned again

disagrees.

First and foremost, the Bank glaringly ignores almost all of Ragan's testimony as it

relates to Taylor's response to her revelation that she allegedly had been forcibly raped several

years earlier by a bank customer.  The Bank dutifully acknowledges at least much of that

testimony in its statement of facts.  (*See id.* at 6-8, ¶ 16).  The Bank's subsequent argument

section of its brief, however, glosses over that evidence almost entirely, reducing it to a

recognition that Ragan had "alleged that Taylor ... on one occasion made her talk about an

alleged rape." (*Id.* at 18).  Taylor's conduct as recounted in Ragan's testimony, however, goes

far beyond that sterilized reduction:  Ragan claims that after she revealed to Taylor that the rape

was the reason she had not called the customer about his past-due account,[13] Taylor refused

Ragan's request to have the customer's account reassigned to another employee and then insisted

---

[13]The Bank couches Ragan's claim on this point as revolving around the fact that "she
divulged to Taylor that she had been raped after Taylor asked why she did not want to place a
collections call to a bank customer." (Dfts. Brief at 21).  It is assumed for present purposes,
however, that Taylor's initial questioning of Ragan about why she did not want to call the
customer about his overdue account was motivated solely by legitimate business considerations,
notwithstanding that such questioning led Ragan to feel that she had to reveal that the customer
had raped her.  Ragan says that, when Taylor asked why she had not called the customer, she
originally gave only a vague explanation about them having had some kind of long-standing
"problem" or "conflict."  However, there would be nothing sexually harassing in requiring Ragan
to explain in greater detail why she was refusing to call, a task that undisputedly would have
otherwise been a routine part of her job.  Nor is there anything to indicate that Taylor was at that
point trying to coerce Ragan into disclosing that she had been raped, a circumstance of which
Taylor appears to have been then ignorant.  Even so, for the reasons stated in the text, a jury
could find that what Taylor allegedly did in response, *after* Ragan told him that she had been
raped, constituted severe, sexually discriminatory harassment.

that she describe to him the rape in all its lurid particulars.  "[Rape] is highly reprehensible, both

in a moral sense and in its almost total contempt for the personal integrity and autonomy of the

female victim and for the latter's privilege of choosing those with whom intimate relationships

are to be established.  Short of homicide, it is the ultimate violation of self."  *Coker v. Georgia*,

433 U.S. 584, 597 (1977).  Taylor's questioning, which he allegedly pursued over Ragan's

responses indicating she did not wish to further talk about the subject, includes where the rape

had occurred, what clothing she was wearing, what sexual position she was in, where her attacker

had held the knife, and what she was thinking while she was being raped.  Taylor allegedly

immediately followed that by telling Ragan that she had not, in fact, been raped and that she

knew that she had "liked it" and "wanted it" because women "enjoy being forced."  As if

enduring those indignities were not enough, Taylor allegedly mocked Ragan on multiple

occasions thereafter, at times in front of others, about claiming to have been raped.  It might be

assumed that such questions and statements, which are "only" verbal in nature, would not

themselves rise to the severity level of a sexual assault.  Nonetheless, where a male supervisor

who is a relative stranger effectively forces a rape victim to recount in grotesque detail precisely

how she was threatened with a knife into having sexual intercourse as an adolescent;

condescendingly denies that she was raped; tells her that she will have to continue servicing her

alleged rapist's account; and makes fun of her for claiming to have been raped, would amount to

an astonishing emotional assault in its own right.  Such gratuitous abuse could be readily

expected to inflict psychological trauma.  *See generally* Christopher C. Kendall, *Rape as a*

*Violent Crime in Aid of Racketeering Activity*, 34 Law & Psychol. Rev. 91, 118 (2010) ("Asking

the victim questions about the rape can be very traumatic since prosecutors can be quite detailed

and include very intimate questions and focus on resistance and the use of force during the attack.").  Indeed, when women are raped they often are hesitant to report it, *see* Lynn Langton et al., Bureau of Justice Statistics, United States Department of Justice, *Victimizations Not Reported to the Police, 2006-2010*, at 4 (2012), http://www.bjs.gov/content/pub/pdf/vnrp0610.pdf (finding sixty-five percent of known rape or sexual assault victimizations go unreported), precisely because "they may be ashamed or fear ... having their own character put on trial, or being forced to relive the incident."  *Hasko v. Gonzalez*, 134 Fed. App'x 575, 579 (3d Cir. 2005) (Ambro, J., concurring).  Assuming that Taylor's conduct occurred as Ragan alleges, as the court must now do, a jury could find it to have been physically threatening, humiliating, and severe, with its impact felt even more keenly given Taylor's status as the highest ranking official at the Bank. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008); *Ellis v. Houston*, 742 F.3d 307, 320 (8th Cir. 2014); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993); *see also Phillips*, 711 F.2d at 1537 (observing that the harassing supervisor, "aware of the importance to Plaintiff of her regular income, rendered her, in effect, an 'economic prisoner'"); *Jennings*, 482 F.3d at 697 (recognizing that the "disparity in power" between university soccer coach and his female players "trapped players into responding to his questions [about their sex lives] and enduring the environment."); *cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998).

It is at least arguable that Taylor's alleged conduct just as it relates to his response to Ragan's disclosure about being raped is sufficiently severe to infer the existence of an actionable hostile work environment.  *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) ("[S]everal courts have recognized ... a single *verbal* (or visual) incident can ... be sufficiently

34

severe to justify a finding of a hostile work environment." (emphasis original)); *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 909 (8th Cir. 2003) (racially hostile graffiti that amounted to a death threat qualifies as severe); *see also Howley*, 217 F.3d at 154 (holding that a harasser's lengthy tirade that included numerous obscene, gender-specific epithets directed at the plaintiff, in a large group in which she was the only female and many of the men were her subordinates, could be viewed as humiliating and resulting in an intolerable alteration of the plaintiff's working conditions). The court need not actually decide whether that is so, however, because Ragan has alleged numerous additional instances of sexually harassing behavior. Those include explicit inquiries and statements by Taylor related to the status of Ragan's marriage, sexual positions, and other intimate details of her sex life; calling Ragan "sexy" approximately every other day, inviting her to sit in his lap on two or three occasions and for her to spank him for being a "bad boy"; suggesting that she accompany him on vacation without her husband and that she "make him happy by having sex with him." Ragan also alleges that Taylor repeatedly complimented her appearance, accompanied by a sexually suggestive tone, leering looks, and the touching of her hair, face, and clothing. She asserts that the "number of inappropriate comments direct towards [her] is too many to count," with sexually harassing incidents "taking place several times each week." (Ragan Aff. at 2). Such testimony suggests that a jury could find that Taylor's sexually harassing conduct was also "pervasive."

Admittedly, many of the compliments and remarks that Ragan identifies could be viewed in isolation as at least relatively innocent or inoffensive. Likewise, the instances of touching she recounts are not the sort of sexually explicit grabbing, fondling, or groping sometimes seen in these cases. The Eleventh Circuit has typically viewed remarks and physical contact similar to

those Ragan alleges here, even if somewhat repetitive, as entitled to little weight in calculating whether harassment altered the terms and conditions of employment.  *See, e.g., Mendoza*, 195 F.3d at 1248-50; *Gupta*, 212 F.3d at 583-86; *Nurse "BE" v. Columbia Palms W. Hosp. Ltd. Partnership*, 490 F.3d 1302, 1309-10 (11th Cir. 2007); *Corbitt v. Home Depot USA, Inc.*, 589 F.3d 1136, 1153-56 (11th Cir. 2009), *opinion vacated*, 598 F.3d 1259 (11th Cir.) (en banc), *remanding with instructions to dismiss*, 611 F.3d 1379 (11th Cir. 2010); *see also Oncale*, 523 U.S. at 81 (noting that "intersexual flirtation" is not sexual harassment).  Nonetheless, as the Eleventh Circuit has observed, "[w]hat can be a 'compliment,' ... between two persons who have a social relationship can be abusive in the workplace-but that is, in many cases, the whole point of the sexual harassment claim."  *Sparks*,830 F.2d at 1561 n.13; *see also Mendoza*, 195 F.3d at 1258 (" Depending upon the circumstances, an employer's comment to an employee that he or she 'looks good today' could be construed as a friendly compliment, a harmless flirtation, or [a] sexually offensive verbal assault ....") (Tjoflat, J., concurring in part and dissenting in part). Here, a jury would be authorized to find that Taylor's even otherwise relatively benign compliments, comments, and touching had a material impact on Ragan's work environment when viewed cumulatively and in the the context of his other more sexually explicit remarks and inquiries.  In particular, it would not be unreasonable for a woman in Ragan's position to feel humiliated or threatened by such attention and repeated, gratuitous physical contact from the employer's highest-ranking supervisor who has not only expressed some sexual interest in her but also made clear his belief that all women, including her specifically, never really mean "no" when they say "no" and are thus fair game to be sexually assaulted.  *See Parker*, 2006 WL 1594427, at *3; *Gregory*, 243 F.3d at 693.

36

Based on the foregoing, a jury could reasonably find Taylor's harassment was sufficiently severe or pervasive, objectively speaking, to create a sexually hostile working environment in violation of Title VII.   Suffice it to say that the Bank's assertion that Taylor's alleged harassment does not amount to "anything more tha[n] flirtatious behavior" that is "far less severe" than the conduct deemed insufficient to create a hostile environment in *Mendoza* and *Lockett v. Choice Hotels Int'l, Inc.*, 315 Fed. App'x 862 (11th Cir. 2009) (Dfts. Brief at 22), fails to view the evidence here in the light most favorable to Ragan and is otherwise unconvincing.   The Bank's motion for summary judgment is due to be denied as it relates to Ragan's hostile work environment claim.

### b.    Other "Gender Discrimination" Claims

Count Three of the Complaint is captioned as a cause of action for "Gender Discrimination."   Ragan alleges therein in relevant part that she

> has been discriminated against on the basis of her sex in regard to her work environment, training, promotion, job assignments, job pay, and terms and conditions of employment, in violation of Title VII. ...   Plaintiff has been discriminated [against] ... because of her sex and has been subjected to unequal treatment and terms and conditions that males were not similarly subjected.

(Compl. ¶ 35).

The Bank has expressly moved for summary judgment on such claims, arguing that there is insufficient evidence in the record to support them.   (Dfts. Brief at 13, 19-20).   While Plaintiffs have opposed the Bank's motion as it relates to Ragan's Title VII claims alleging she was subjected to a hostile work environment and later to unlawful retaliation, Plaintiffs have offered no response to the Bank's argument that it is entitled to summary judgment with regard to the other "gender discrimination" claims in Count Three.   As a result, such claims have been

37

abandoned.  *See Jones v. Bank of Amer., N.A.*, ___ Fed. App'x ___, ___, 2014 WL 1642622, at

*2 (11th Cir. April 25, 2014); *Iraola & CIA, S.A. v. Kimberly–Clark Corp.*, 325 F.3d 1274,

1284–85 (11th Cir. 2003); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler

Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).  The Bank's motion for summary judgment is due to

be granted as it relates to Plaintiff's Title VII sex discrimination claims not based on allegations

that she endured a hostile environment.

### c.   Title VII Retaliation

In Count Four, Ragan alleges that the Bank retaliated against her in violation of Title VII.

In order to make out a prima facie case of retaliation, the plaintiff has the burden at trial to

establish the following: (1) that she engaged in an activity protected under Title VII; (2) she

suffered a materially adverse action; and (3) there was a causal connection between the protected

activity and the adverse action.  *Kidd v. Mando American Corp.*, 731 F.3d 1196, 1211 (11th Cir.

2013).

The Bank contends that it is entitled to summary judgment on Ragan's retaliation claim

alleging that she was terminated shortly after complaining to Taylor about his sexually harassing

conduct and threatened to tell his wife about it.  The Bank attacks only the first element of the

prima facie case, *i.e.*, whether Ragan's complaint constituted protected activity.  In so doing, the

Bank assumes that the substance of Ragan's complaint was as set forth in her deposition, to the

effect that, after Taylor made a sexually suggestive remark, she responded by telling him that if

he "didn't quit hitting on [her] [she] was going to have to say something to [his wife]."  (Dfts.

Brief at 23-24 (quoting Ragan Dep. at 132-33)).

Ragan's complaint at issue occurred prior to her filing of an EEOC charge and did not

otherwise involve an EEOC investigation.  Accordingly, the operative provision of 42 U.S.C. §

2000e-3(a) relating to her instant retaliation claim would be the "opposition clause" rather than

the "participation clause."  *See EEOC v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th

Cir. 2000).  Title VII's opposition clause makes it "unlawful ... for an employer to discriminate

against any ... employe[e] ... because he has opposed any practice made ... unlawful ... by this

subchapter."  § 2000e-3(a).  An employee's internal complaint to her superior about sexual

harassment may qualify as protected opposition.  *Pipkins v. City of Temple Terrace, Fla.*, 267

F.3d 1197, 1201 (11th Cir. 2001); *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d

397, 400 (11th Cir. 1989).  Nonetheless, a "complaint about an employment practice constitutes

protected opposition only if the individual explicitly or implicitly communicates a belief that the

practice constitutes unlawful employment discrimination."  *Murphy v. City of Aventura*, 383 Fed.

App'x 915, 918 (11th Cir. 2010); *see also Galdieri-Ambrosini v. National Realty & Dev. Corp.*,

136 F.3d 276, 292 (2d Cir. 1998) (requiring proof that the employer "understood, or could have

reasonably understood, that the plaintiff's opposition was directed at conduct prohibited by Title

VII."); *cf. Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, ___, 131 S. Ct. 1325,

1334 (2011) (in order to qualify as protected activity for purposes of a retaliation claim under the

Fair Labor Standards Act, an employee's oral "complaint must be sufficiently clear and detailed

for a reasonable employer to understand it, in light of both content and context, as an assertion of

rights protected by the statute and call for their protection.").  Thus,"[A]lthough an employee

need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title

VII's retaliation protections," *Sitar v. Indiana DOT*, 344 F.3d 720, 727 (7th Cir. 2003), her

complaint must reasonably convey to the employer an allegation of employment discrimination

39

based upon sex rather than merely a claim related to personal animosity, unfairness, or indecorous treatment generally. *See Coutu v. Martin Cnty. Bd. of Cnty. Com'rs*, 47 F.3d 1068, 1075 (11th Cir.1995); *see also Murphy*, 383 Fed. App'x at 918 (no protected opposition where plaintiff asked her harasser to "to stop bullying her" and complained to other managers that the harasser "had used 'vulgar, inappropriate language' and had engaged in 'bullying, yelling, and screaming'"). However, even if the conduct about which the plaintiff complains is not, in fact, an unlawful employment practice under Title VII, her complaint may be protected provided that she had a good faith, reasonable belief that the employer's conduct was illegal. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997); *Lipphardt*, 267 F.3d at 1187-89; *see also Breeden*, 532 U.S. at 270-71.

In arguing that Ragan's complaint and threat to Taylor was not protected activity, the Bank makes two principal arguments. The Bank first argues that her statement did not amount to opposition to an unlawful employment practice because "Ragan did not mention harassment or discrimination in her comment to Taylor[,] and she does not even tell him to stop." (*Id.* at 24). Second, the Bank claims that because "workplace flirting is not actionable sexual harassment, ... even if Ragan subjectively believed that her comment was in opposition to unlawful sexual harassment, her belie[f] was not objectively reasonable." (*Id.*)

There are several flaws in the Bank's arguments. First, the Bank's assertion that Ragan's complaint to Taylor, as quoted from her deposition, does not communicate insistence that he "stop" behavior she found objectionable is untenable. Ragan's threat to tell Taylor's wife about his conduct unless he "quit" doing it unmistakably conveys a demand that it cease. *See* http://www.merriam-webster.com/dictionary/quit (defining the verb "quit" as including "to stop

40

doing (an action or activity)" and indicating that "stop" is a synonym); *Melgarejo v. 24 Hour Professional Janitorial Services, LP*, 2008 WL 958203, at *3 (N.D. Tex. Apr. 8, 2008) (recognizing that the plaintiff's allegations that she complained to the owner of the business who was sexually harassing her and threatened to tell his wife about his behavior was protected activity).  The salient question here is not whether Ragan "opposed" Taylor's conduct; she clearly did so.  *See Crawford v. Metropolitan Gov't of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 276 (2009) ("The term 'oppose,' being left undefined by the statute, carries its ordinary meaning: to resist or antagonize ...; to contend against; to confront; resist; withstand" (citations and internal quotation marks omitted)).

Second, the Bank is also wrong to the extent it suggests that Ragan's complaint could not be construed to communicate a belief that Taylor's perceived treatment was motivated by her sex.  Again, taking just Ragan's deposition testimony quoted by the Bank, Ragan told Taylor to quit "hitting on" her.  That expression unambiguously evidences that Ragan was objecting to conduct that she perceived as a sexual advance.  *See generally, e.g., Van Der Meulen v. Brinker Intern.*, 153 Fed. App'x 649, 653 (11th Cir. 2005) ("She stated that Marks 'was always hitting on the younger [female employees],' and making 'sexual comments' about their bodies and the way that they were dressed.").  As such, a jury could infer that Taylor understood that Ragan's objection to being "hit on" was a complaint about perceived mistreatment based on her sex.  *See, e.g., Whitten v. Fred's Inc.*, 601 F.3d 231, 237 n. 1 (4th Cir. 2010), abrogated on other grounds, *Vance v. Ball State Univ.*, ___ U.S. ___, 133 S. Ct. 2434 (2013); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), abrogated on other grounds, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d

1237, 1253 (M.D. Ala. 2001); *Langley v. Dolgencorp, LLC*, 972 F. Supp. 2d 804, 813 (D.S.C. 2013); *see also Oncale*, 523 U.S. at 80 (explaining that it is easy to draw an inference of sex discrimination where conduct "involves explicit or implicit proposals of sexual activity").

Third, the Bank's is also incorrect to posit that Ragan's complaint could not be protected because she allegedly could not have had an objectively reasonable belief that Taylor's conduct violated Title VII.  Insofar as the Bank's argument amounts to a claim that Ragan could not have reasonably believed that Taylor's alleged harassment, *viewed in its entirety*, was actionable, it is easily rejected.  For reasons already explained, the evidence supports the even higher showing that Taylor's conduct *actually* created a sexually hostile work environment.  That is enough to establish the requisite objectively reasonable belief, *see EEOC v. White & Sons Enterprises*, 881 F.2d 1006, 1012 n. 5 (11th Cir. 1989); *Royal v. CCC&R Tres Arboles, LLC*, 736 F.3d 396, 401 n. 2 (5th Cir. 2013), at least where, as here, the plaintiff is aware of all of the underlying harassment.  *See Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1352 (11th Cir. 1999).

However, one might also construe this argument by the Bank as claiming more pointedly that Ragan's complaint to Taylor was not protected because it referenced an objection only to his "hitting on" her.  Such conduct, the Bank seems to suggest, would itself amount merely to "workplace flirting" (Dfts. Brief at 24) that, standing alone, does not constitute an "unlawful employment practice" under Title VII and that Ragan could not have reasonably believed otherwise.  Whether a plaintiff could have had an objectively reasonable belief that conduct complained of violated Title VII is considered in light of controlling judicial decisions.  *Butler v. Alabama DOT*, 536 F.3d 1209, 1214 (11th Cir. 2008).  As such, it might be assumed that any belief on Ragan's part that whatever discrete, flirtatious or sexually suggestive remark by Taylor

42

prompted her complaint on this particular occasion itself violated Title VII would be

unreasonable given the substantive law.  *See Breeden*, 532 U.S. at 271-72; *Clover*, 176 F.3d at

1351.

The Bank, however, has not cited any authority suggesting that, in order to constitute

protected opposition, a plaintiff's sexual harassment complaint to her employer must spell out the

details of underlying incidents in a manner demonstrating the existence of an actionable hostile

environment.  To the contrary, the Ninth Circuit has recognized:

> [I]f a person has been subjected to more than one comment, and if those
> comments, taken together, would be considered by a reasonable person to violate
> Title VII, that person need not complain specifically about all of the comments to
> which he or she has been subjected.  Unreported comments, in other words, are
> relevant to the inquiry concerning the reasonableness of the belief that a violation
> has occurred.  In such circumstances, a complaint about one or more of these
> comments is protected behavior.

*EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 954 (9th Cir. 2009); *accord Reed v. A.W.*

*Lawrence Co.*, 95 F.3d 1170, 1178-80 (2d Cir. 1996) (complaint about a co-worker's sexually

vulgar comment could be protected activity where plaintiff could have had a reasonable belief

that the comment contributed to the creation of a hostile work environment in light of earlier

sexually discriminatory remarks and conduct, even if one could not reasonably think that the final

comment alone violated Title VII).  That principle is arguably even more apt where, as here, a

female plaintiff complains to a supervisor who is himself the alleged harasser and she demands

that he cease engaging in sexually harassing conduct.  In that setting, the supervisor would

necessarily be aware of all preceding instances of his own sexually harassing conduct, so there is

less concern that he might fail to apprehend its broader context.  Thus, such a complaint made to

the harassing supervisor, accompanied by a demand that he cease engaging in sexually harassing

conduct generally, may be protected where the employee could reasonably believe that the supervisor's harassment, viewed cumulatively, was unlawful under Title VII.  *See Ross v. Baldwin County Bd. of Educ.*, 2008 WL 820573, at *5-6 (S.D. Ala. Mar. 24, 2008); *Quarles v. McDuffie County*, 949 F. Supp. 846, 853 (S.D. Ga. 1996); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000); *EEOC v. New Breed Logistics*, 962 F. Supp. 2d 1001, 1017 & n. 73 (W.D. Tenn. 2013); *see also Melgarejo* 2008 WL 958203, at *3; *but cf. LaMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir. 2007) ("rejecting sexual advances" is not itself protected activity); *Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 438-39 (S.D.N.Y. 1996) ("simply declining a harasser's sexual advances" is not protected activity under Title VII).  That is even more true here insofar as the Bank's own policies and procedures effectively designated Taylor, ironically enough, as the only employer representative to whom Ragan might voice sexual harassment complaints.

Finally, even if one might still be inclined to construe Ragan's complaint insisting that Taylor "quit hitting on" her as too vague to put the employer on notice that she was opposing an "unlawful employment practice," the record does not, contrary to the Bank's assumption, cabin the substance of Ragan's complaint to such language.  While Ragan uses the "hitting on" phraseology in her deposition, she describes her statement a bit differently in other sworn testimony.  In particular, she relates in her affidavit that, after Taylor made a sexually explicit remark to her, she replied that if "he did not begin to respect [her] and stop harassing [her], [she] would have no other choice than to speak with his wife about the problem."  (Ragan Aff. at 5). Similarly, Ragan alleges in her EEOC charge that she "informed [Taylor] that if the sexual harassment did not stop, I would tell his wife, who is a bank employee."  (Doc. 1-1 at 1).  Both of

44

those formulations characterize Taylor's objectionable conduct as at least "harassing," if not

expressly as "sexual harassment."  Given the evidence of extensive prior sexual harassment by

Taylor and that Ragan's instant complaint and threat came immediately on the heels of a sexually

suggestive remark, her use of a form of the word "harass," a legal buzzword long associated with

Title VII hostile environment claims, even more clearly conveys reference to an allegedly

unlawful employment practice.  *See Okoli v. City of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011)

("The City surely should have known that Okoli's complaints of 'harassment' likely

encompassed sexual harassment"); *cf. Olson v. Lowe's Home Ctrs. Inc.*, 130 Fed. App'x 380,

391 n. 22 (11th Cir. 2005) ("There is no magic word requirement. That is, the employee need not

label the events 'sexual harassment' in order to place an employer on notice of the offending

behavior.").  Ragan's sworn testimony in her affidavit and EEOC charge thus further support that

the Bank's arguments that the evidence fails to support that Ragan engaged in protected

opposition.[14]  The Bank's motion for summary judgment is due to be denied as it relates to this

---

[14]There is some discrepancy between Ragan's deposition and the sworn statements in her affidavit and EEOC charge as it relates to exactly what she said to Taylor on the occasion in question.  However, Bank has not moved to strike Ragan's affidavit or EEOC charge pursuant to the "sham affidavit" doctrine, whereby a court may exclude a party's affidavit to the extent it contradicts prior sworn deposition testimony in an effort to create an issue of fact at summary judgment.  *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  That doctrine typically involves an affidavit that contradicts *earlier* deposition testimony. Here, by contrast, Ragan executed her EEOC charge and affidavit more than two years before she was first deposed.  Thus, neither her affidavit nor her EEOC charge could be a "sham" in the strict sense of having been created specifically for the purpose of overcoming unfavorable deposition testimony at summary judgment.  *See Chandler v. Volunteers of Amer., N. Ala., Inc.*, 2013 WL 832133, at *3 (N.D. Ala. Feb. 28, 2013); *Williams v. Asplundh Tree Expert Co.*, 2006 WL 1793551, at *3 (M.D. Fla. June 28, 2006).  Nonetheless, it might be assumed that a court might still credit deposition testimony in which a party recants or otherwise unambiguously contradicts statements appearing in an earlier affidavit.  *See In re CitX Corp., Inc.*, 448 F.3d 672, 679-80 (3d Cir. 2006); *Darnell v. Target Stores*, 16 F.3d 174, 176-77 (7th Cir. 1994); *see also, e.g., Santhuff v. Seitz*, 385 Fed. App'x 939, 944-45 (11th Cir. 2010) (affirming the district court's

claim for retaliation under Title VII.

**B.      State Law Claims**

**1.      Negligent/Wanton Hiring, Training, Supervision, and Retention**

In Count Five, Plaintiffs assert claims against the Bank based upon its alleged negligence or wantonness associated with its hiring, training, supervision, and retention of Taylor.  These claims, like all of Plaintiffs' non-Title VII claims, are governed by Alabama substantive law.  *See Erie v. Tompkins*, 304 U.S. 64 (1938); *Jones v. United Space Alliance, LLC*, 494 F.3d 1306, 1309 (11th Cir. 2007).  The Alabama Supreme Court has described the crux of this cause of action as follows:

---

disregard of an affidavit in light of later deposition testimony, albeit without mentioning the sequencing issue).  Deposition testimony subject to cross-examination is generally thought more reliable than an *ex parte* sworn statement, and subsequent deposition testimony may show that a party is no longer willing or able to testify as set forth in his affidavit such that he will not be able to meet his burden of proof at trial.  Regardless of the sequence of testimony, however, the sham affidavit doctrine is applied "sparingly" in this circuit.  *Allen v. Board of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007).  "To allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the ... affiant ... was stating the truth." *Tippens*, 805 F.2d at 953-54.  Thus, an affidavit may be disregarded only where it "contradicts, without explanation," deposition testimony consisting of "clear answers to unambiguous questions."  *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) (quoting *Van T. Junkins*, 736 F.2d at 657); *see also Tippens*, 805 F.2d at 954 (requiring courts to find the affidavit to be "inherently inconsistent" with deposition testimony).  Defendants have not cited any of this caselaw nor attempted to demonstrate that the allegations in Ragan's affidavit or EEOC charge allegations so inherently and unambiguously contradict her deposition that the affidavit or EEOC charge are due to be disregarded.  Moreover, although "cross-examining the affiant in a later deposition seems the better way to find the flaws in a bogus affidavit," *In re CitX*, 448 F.3d at 679-80, and it appears that Ragan's affidavit was furnished to the defense in advance of her deposition (*see* Pl. Opp. Brief at 5 n.1, citing Doc. 55-7), Defendants' counsel did not cross-examine Ragan specifically about her affidavit.  *See Nelson v. PMTD Restaurants, LLC*, 2013 WL 4045806, at *4 (M.D. Ala. Aug. 8, 2013).  Accordingly, the undersigned has considered Ragan's affidavit and EEOC charge in ascertaining the circumstances alleged to exist for purposes of summary judgment.

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him.  Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.  It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.  While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Armstrong Business Services, Inc., v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001); *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala.1993) (quoting *Lane v. Central Bank of Ala.*, *N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983) (quoting *Thompson v. Havard*, 285 Ala. 718, 725, 235 So. 2d 853 (1970))).

The Bank has moved for summary judgment on these claims, point to evidence indicating that it had received no prior complaints about sexual harassment by Taylor nor any other notice that he was supposedly incompetent based upon a propensity to engage in such conduct.  (Dfts. Brief at 21-23).  Plaintiffs respond that summary judgment is due to be denied based on evidence that, before sexually harassing Ragan, Taylor had done likewise to another female employee of the Bank, Charlotte Doss.  (Pls. Opp. Brief at 33; *see also id.* at 15-16, ¶ 4).  Doss was employed by the Bank from 1975 to 1991, during which time Taylor was a Vice President and Loan Officer.  (Doc. 55-4 ("Doss Aff.") at 1).  Doss suggests that she did not feel "comfortable" being alone with Taylor, and she identifies several instances of his behavior that she considered sexual

or gender related, as follows: (1) Taylor once "cornered" Doss in the bank vault and said, "Come on now, give me a kiss"; (2) he once told Doss that they would "have a real good time" if she would accompany him to a farm that was owned by Taylor or someone else; (3) on "numerous occasions," Taylor, in front of other employees, made "inappropriate comments" to his own wife, who also worked at the Bank, including remarks about her weight, telling her that her makeup made her "look like a whore," and calling her "stupid" and "dumb"; and (4) Taylor made "suggestive comments" such as "You are sure looking good today" and "You sure do smell good today."  (Doss. Aff. at 1-2).

Plaintiffs' evidence regarding Taylor's treatment of Doss falls far short of creating an issue of fact with regard to whether the Bank had prior notice of Taylor's alleged propensity to sexually harass female employees so as to be deemed incompetent.  Even considering all of the conduct that Doss identifies, it is highly doubtful that, as described, it would support any tort cause of action under Alabama law, and it does not come close to being sufficiently severe or pervasive to constitute a sexually hostile work environment actionable under Title VII.  Further, it undisputed that Doss did not complain to anyone about Taylor's behavior, and the only conduct she claims was witnessed by anyone else amounted to a mix of insults that Taylor directed at his own wife.  Even then, such remarks would be tied intimately to the dynamics of their personal relationship, as distinct from simply his wife's sex.  *See Pipkins*, 267 F.3d at 1200-01; *Succar v. Dade County Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000).  Finally, the alleged conduct Doss describes would have occurred about 17 years or more before Ragan was even hired, and there is no evidence of any further complaints in the interim.  Doss's testimony fails to support that the Bank knew or should have known at the time Ragan was employed that Taylor was incompetent

based on an alleged predisposition to engage in tortious, sexually harassing conduct towards

other women.  *See Speigner v. Shoal Creek Drummond Mine*, 402 Fed. App'x 428, 433 (11th

Cir. 2010).  The Bank is entitled to summary judgment on the claims in Count Five.

> **2.      Invasion of Privacy**

In Count Six, Plaintiffs assert that Defendants are liable for "invasion of privacy" under

Alabama law.  The Alabama Supreme Court has defined the tort of invasion of privacy as the

"'intentional wrongful intrusion into one's private activities in such a manner as to outrage or

cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.'"  *Rosen v.*

*Montgomery Surgical Ctr.*, 825 So. 2d 735, 737 (Ala. 2001) (quoting *Carter v. Innisfree Hotel,*

*Inc.*, 661 So. 2d 1174, 1178 (Ala. 1995)).

> The tort of invasion of privacy consists of four limited and distinct wrongs: (1)
> intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to
> private information about the plaintiff that violates ordinary decency; (3) putting
> the plaintiff in a false, but not necessarily defamatory, position in the public eye;
> or (4) appropriating some element of the plaintiff's personality for a commercial
> use.

*S.B. v. Saint James School*, 959 So. 2d 72, 90 (Ala. 2006) (internal quotation marks omitted); *see*

*also Cash v. Smith*, 231 F.3d 1301, 1308 (11th Cir. 2000).  "Each of these categories of invasion

of privacy has distinct elements, and each category establishes a separate privacy interest that

may be invaded."  *Saint James School*, 959 So. 2d at 90 (citing *Regions Bank v. Plott*, 897 So. 2d

239 (Ala. 2004).  In bringing these claims, Plaintiffs rely on the first three variants of the tort,

which are based on §§ 652B, 652D, and 652E of the *Restatement (Second) of Torts* (hereinafter

the "*Restatement*") (1977).  (*See* Compl. ¶¶ 53, 55; Pls. Opp. Brief at 35-39).  The parties'

summary judgment arguments relative to each theory are considered in turn.

Under the wrongful-intrusion theory,

> one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Saint James School*, 959 So. 2d at 90 (quoting *Restatement* § 652B).   The Alabama Supreme Court has further explained:

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.  The wrongful intrusion may be by physical intrusion into a place where the plaintiff has secluded himself, by discovering the plaintiff's private affairs through wiretapping or eavesdropping, or by some investigation into the plaintiff's private concerns, such as opening private mail or examining a private bank account.  Further, if the means of gathering the information are excessively objectionable and improper, a wrongful intrusion may occur.

*Id.* at 90-91 (quoting *Johnston v. Fuller*, 706 So. 2d 700, 702 (Ala. 1997) (internal quotation marks and citations omitted)).  Thus, to succeed on a claim of this nature relating to sexual harassment,

> a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation.  *Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 323 (Ala. 1989).  While asking a co-employee for a date and making sexual propositions usually do not constitute an invasion of privacy, *see McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986), extensive inquiries into one's sex life or looking up one's skirt may constitute an invasion of privacy, *see Phillips v. Smalley Maintenance Services*, 435 So. 2d 705, 709 (Ala.1983); Restatement (Second) of Torts § 652B cmt. c, ex. 7.

*Ex parte Atmore Community Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998).

Ragan has testified that Taylor directed sexually explicit remarks and questions to her on multiple occasions seeking information about her sex life with her husband, including "how good

50

the sex was" and what positions they preferred.  Ragan further claims that, later, when she

explained to Taylor that she did not want to call a bank customer because he had raped her at

knife point several years earlier, Taylor responded by insistently demanding that Ragan tell him

all of the intimate details of the rape.  Even after Ragan indicated that she did not want to discuss

the subject, Taylor's questioning allegedly included where the rape had occurred, what Ragan

had been wearing, what sexual position she was in, where her attacker had held the knife, and

what she was thinking while she was being raped.  He then allegedly told her that she had not

been raped and had instead "wanted it" because, he asserted, women "enjoy" being forced.

Taylor thereafter also allegedly taunted her on multiple occasions about claiming to have been

raped.  Such evidence, in conjunction with the other evidence underlying her hostile environment

claim, is sufficient from which to infer that Taylor pried and otherwise unduly intruded into

Ragan's private affairs so as to support liability under this theory.  *See Phillips*, 435 So. 2d at

706-08, 711; *Ex parte Atmore Community Hosp.*, 719 So. 2d at 1194; *Cunningham v. Dabbs*, 703

So. 2d 979, 982 (Ala. Civ. App. 1997); *Armstrong v. Standard Furniture*, 197 Fed. App'x 830,

834 (11th Cir. 2006).  The Defendants' motion for summary judgment is due to be denied as to

claims for invasion of privacy under the wrongful-intrusion theory.[15]

   Under an invasion of privacy claim based on § 652D of the Restatement, liability may be

imposed against one "who gives publicity to a matter concerning the private life of another ... if

the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public." *Johnston*, 706 So. 2d at 703 (quoting *Restatement*

---

   [15]While there may be legal arguments to be made to the effect that the Bank cannot be held liable for state-law torts allegedly committed by Taylor, the Bank does not assert such ground as a basis for summary judgment on those claims.

§ 652D).  Likewise, under the "false light" invasion-of-privacy tort set forth in § 652E,

> [o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
>> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>>
>> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Plott*, 897 So. 2d at 244 (quoting *Restatement* § 652E) (internal quotation marks and other citations omitted).  Thus, under both §§ 652D and 652E, a plaintiff is required to establish that the defendant gave "publicity" to a particular type fact.  *See Saint James School*, 959 So. 2d at 72, 93.  The key difference between the respective causes of action under §§ 652D and 652E is the type of information to which the defendant must have given publicity.  Under § 652D, the fact publicized must be a matter "concerning the private, as distinguished from the public, life of the individual."  Restatement § 652D cmt. b.  By contrast, a false-light claim under § 652E does not require that the information made public be private; it requires that the information be false. *Plott*, 897 So. 2d at 244.

With regard to the former tort, giving publicity to private information, Defendants concede that Ragan "does allege that Taylor obtained information from her that would be private concerning ... an alleged rape ...."  (Dfts. Brief at 29).  Defendants point out, however, that Taylor testified that he did not tell anyone else about Ragan's allegation that she had been raped (*see* Taylor Dep. at 172-73), and Defendants maintain that there is no contrary evidence "that Defendants published her personal affairs that were not meant to be public."  (Dfts. Brief at 29).

Because "Ragan's allegation that Defendants published private information [about her is] not supported," Defendants argue, this claim fails as a matter of law.  (*Id.*)

However, Ragan testified that, after she revealed in a private conversation with Taylor that she had been raped, he taunted her about it on multiple occasions thereafter, including by asking rhetorically whether the customer was the person she said had raped her.  More to the point, Ragan further testified that Taylor engaged in such mocking behavior in public, in front of other employees and customers of the Bank. (*See* Ragan Dep. 169-72, 212-14; Ragan Aff. at 5). Because the Bank's motion does not contest that such publication[16] to third parties of private information about Ragan's claim to have been been raped could support a claim for invasion of privacy, Defendants are not entitled to summary judgment.

With respect to the third theory of liability for invasion of privacy, Plaintiffs have pled that "Taylor placed [Ragan] in a false and defamatory light."  (Compl. ¶ 55).  The Complaint indicates that such cause of action is also based on Ragan's allegation that Taylor taunted her in front of others about claiming to have been raped by the bank customer, including by making remarks that she had "enjoyed it" and otherwise suggesting that her claim was false or illegitimate.  (*Id.* ¶¶ 20, 51; *see also Ragan Dep.* 169-72, 212-14).  Again, however, Defendants'

---

[16]Strictly speaking, liability for invasion of privacy under both the "publicity to private information" and "false light" theories requires that the defendant give "publicity" to the subject information, not merely that the defendant "published" such information to a third party.  *See Butler*, 871 So. 2d at 13.  While Ragan's testimony that Taylor verbally mocked her at work on several occasions within earshot of others about claiming to have been raped by a named bank customer is sufficient to establish "publication" of that information, it is questionable whether such evidence is sufficient to establish that Taylor gave "publicity" to it.  Nonetheless, the Bank's motion as it relates to this claim is based on the proposition that "Ragan has offered no evidence regarding the *publication* of her personal affairs" (Dfts' Brief at 29 (emphasis added)), and Defendants do not sufficiently argue the legal distinction between "publicity" and "publication" in this context or how it might apply to the evidence before the court.

motion seeks summary judgment on Ragan's invasion-of-privacy claims related to the disclosure of her personal affairs based solely on the premise that she has no proof that Taylor "published"[17] any information about Ragan's allegation that she had been raped. (Dfts. Brief at 29).  As stated above, there is evidence that Taylor did, in fact, make such statements in front of third parties. Accordingly, Defendants have failed to establish that they are entitled to summary judgment as to these claims.

### 3.      Assault and Battery

In Count Seven, Ragan alleges that Defendants are liable under the interrelated tort theories of assault and battery.  Under Alabama law,

> an assault consists of 'an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'  *Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (citations omitted). A battery has been defined by the Alabama Supreme Court as follows: 'A successful assault becomes a battery.  A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner ... to lay hands on another in a hostile manner is a battery, although no damage follows.'  *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (1986).

*Peterson v. BMI Refractories*, 132 F.3d 1405, 1412-13 (11th Cir. 1998) (emphasis omitted); *see also O'Rear v. B.H.*, 69 So. 3d 106, 117 (Ala. 2011); *Walker v. City of Huntsville*, 62 So. 3d 474, 494 (Ala. 2010).  Battery also encompasses the rude or offensive touching of another person's clothing.  *Hyde v. Cain*, 47 So. 1014, 1014 (Ala. 1908); *Mills v. Wex-Tex Industries, Inc.*, 991 F. Supp. 1370, 1382 (M.D. Ala. 1997).  "The wrong [in committing a battery] consists, not in the touching so much as in the manner or spirit in which it is done, and the question of bodily pain is

---

[17]*See* note 16, *supra*.

important only as affecting damages." *Harper v. Winston County*, 892 So. 2d 346, 353 (Ala. 2004) (quoting *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986), quoting *Singer Sewing Machine Co. v. Methvin*, 63 So. 997, 1000 (Ala. 1913)).

Ragan alleges that Taylor touched her face and played with her hair. She says that he frequently placed his hand on the small of her back to "guide" her closer to him, ostensibly to view documents she was holding. Ragan also claims that Taylor at times tugged on her skirt and blouse, including one time where he untied the strings securing the latter, put his arm on her to stop her from walking away from him, and instructed her to allow him to retie them while suggesting that it might appear to other employees that they were having a sexual affair. While these are not blatantly offensive physical contacts, there is sufficient evidence from which to infer that such touching was intentional, gratuitous, conducted with sexual overtones, and was unwelcome. As such, there is sufficient evidence from which a jury could find that Taylor committed a battery, the apprehension of which by Ragan would give rise to an assault. *See Atmore Community Hosp.*, 719 F.2d at 1194; *Bryars v. Kirby's Spectrum Collision, Inc.*, 2009 WL 1286006, at *16 (S.D. Ala. May 7, 2009); *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1356 (M.D. Ala. 2009). Defendants motion is due to be denied as to these claims as well.

### 4.    Intentional Infliction of Emotional Distress

In Count Eight, Ragan asserts that Defendants are liable for intentional infliction of emotional distress, otherwise known as the tort of "outrage." *See Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012). The Alabama Supreme Court has explained as follows with regard to this cause of action:

[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.  The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

* * *

The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement, and (3) egregious sexual harassment.  In order to recover, a plaintiff must demonstrate that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.

*Bole*, 103 So. 3d at 52 (citations and internal quotation marks omitted).

Defendants argue that they are entitled to summary judgment on Ragan's outrage claim because, they assert, the evidence is insufficient to establish that any of Defendants' alleged conduct was so outrageous as to cause a person of ordinary sensibilities to suffer severe emotional distress or that such conduct goes beyond all possible bounds of decency.  (Dfts. Brief at 27-30).  Again, however, in making such arguments, Defendants conveniently whitewash the details of Taylor's conduct as it relates to his response to Ragan's disclosure that she had been raped at knife point several years earlier while in high school.  That conduct includes Taylor allegedly using his power as the Bank's highest-ranking employee to coerce Ragan into answering questions seeking all of the intimate details of how she was raped, including what sexual position she was in, what clothing she was wearing, where her attacker held the knife, and what she was thinking during the episode.  It further includes allegations that Taylor denied

Ragan's request to have the servicing of her rapist's loan account reassigned to another Bank employee; told Ragan that her being forced to have sexual intercourse was not actually rape because women "enjoy being forced" and that she knew she "wanted it"; and taunted Ragan on multiple occasions, sometimes in front of others, about claiming to have been raped. Ragan also alleges that Taylor engaged in numerous other instances of sexually harassing behavior previously described, including sexually explicit questions and statements related to Ragan's marriage and her sex life. While not doing so lightly, the undersigned views Ragan's testimony, particularly as its relates to Taylor's alleged response to her claim of rape, as evidencing the kind of sufficiently "egregious sexual harassment" necessary to create a jury question precluding the entry of summary judgment on her outrage claims against Defendants.[18] *See Henry v. Georgia-Pacific Corp.*, 730 So. 2d 119, 119-21 (Ala. 1998).

### 5.    Breach of Implied Contract

In Count Nine, Ragan asserts a claim under Alabama state law for breach of an implied contract, based on allegations that the Defendants failed to "keep confidential, personal information given to them." (Compl. ¶¶ 74, 76). After Defendants moved for summary judgment on this claim (Dfts. Brief at 32-33), Plaintiffs responded by consenting to its voluntary

---

[18]Even assuming for the sake of argument that the evidence does not quite clear the high bar established by the Alabama courts to prevail on an outrage claim, given the recommendation that other federal- and state-law claims relying on the identical evidence be allowed to proceed to trial, it still would be prudent for the court to exercise its discretion to deny summary judgment on the outrage claims. *See Lind v. UPS, Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001) ("[E]ven in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." (internal quotation marks omitted)); *Harris v. Byner*, 2014 WL 129040, at *10 n. 5 (M.D. Ala. Jan. 14, 2014); 10A Wright, Miller & Kane, Fed. Prac. & Proc. Civ. § 2728 (3d ed.). This is especially true given the availability of special verdict forms, allowing the court to discern exactly what claim(s) upon which a jury has predicated any liability.

dismissal.  (Pltfs. Opp. Brief at 48).  Accordingly, the Bank's motion for summary judgment is due to be granted as it relates to this claim.

### 6.      Loss of Consortium

In the tenth and final count of the Complaint, Mitch asserts a claim for loss of consortium.  Recognizing that is that liability on such a claim is derivative of the claims of the injured spouse, Defendants assert that they are entitled summary judgment on this claim based solely on an assumption that they are entitled to prevail as a matter of law on all claims asserted against them by Ragan.  *See Lyons v. Vaughn Regional Med. Ctr.*, LLC, 23 So. 3d 23, 29 (Ala. 2009).  However, because Defendants' assumption about the potential validity of Ragan's claims is erroneous, Defendants are not entitled to summary judgment on Mitch's claim for loss of consortium, either.

## IV.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Defendants' motion for summary judgment (Doc. 44) be **GRANTED IN PART AND DENIED IN PART**.  In particular, the motion is due to be granted as it relates to the following: (1) all Title VII claims against Taylor; (2) Ragan's Title VII claims asserted in Count Three against the Bank for "Gender Discrimination" other than for creation of a hostile working environment; (3) Ragan's state-law claims in Count Five against the Bank for negligent or wanton hiring, supervision, training, and retention; and (4) Ragan's state-law claims in Count Nine for breach of implied contract. It is **RECOMMENDED** that those claims be **DISMISSED WITH PREJUDICE**.  Defendants' motion for summary judgment is otherwise due to be denied.

**<u>Notice of Right to Object</u>**

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), FED. R. CIV. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

**DONE**, this the 13th day of June, 2014.

*John E. Ott*

**JOHN E. OTT**
Chief United States Magistrate Judge